J. S31042/17

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

IN RE: ADOPTION OF: A.N.S., AND    :    IN THE SUPERIOR COURT OF
T.S., JR., MINORS    :      PENNSYLVANIA
   :
APPEAL OF: T.S., SR., NATURAL    :      No. 218 WDA 2017
FATHER    :

Appeal from the Order, December 28, 2016,
in the Court of Common Pleas of Cambria County
Orphans' Court Division at Nos. 2016-205 IVT,
2016-206 IVT

BEFORE: PANELLA, J., DUBOW, J., AND FORD ELLIOTT, P.J.E.

MEMORANDUM BY FORD ELLIOTT, P.J.E.:      **FILED MAY 26, 2017**

Appellant, T.S., Sr. ("Father"), appeals from the order of December 28, 2016, terminating his parental rights to the children, A.N.S. and T.S., Jr. ("the Children"). After careful review, we affirm.

The trial court, following three evidentiary hearings, made the following findings:

> 1. On March 9, 2016, Cambria County Children and Youth Services ("CYS") filed petitions to terminate the parental rights of [K.D., "Mother"], age 23, [], and [Father], age 32, [], to their respective children. [Mother] is the biological mother of [J.D.D.], [] age 3, []; [A.N.S.], [] age 2, []; and [T.S., Jr.], [] now 11 months old []. [Father] is the biological father of [A.N.S.] and [T.S., Jr.]. The biological father of [J.D.D.] is unknown. The grounds alleged are 23 Pa.C.S.[A.] Section 2511(a) Subsections (1), (2), (5), and (8).
>
> 2. Counsel was appointed for the parents and children, and after continuance requests granted by

the Court evidentiary hearings were held on June 22, 2016; September 20, 2016; and September 29, 2016. After transcripts of the hearings were prepared and reviewed by counsel, all counsel submitted memoranda of their respective positions.

3. In July 2014, [Mother] and [Father] moved to Johnstown, Cambria County, Pennsylvania from Onondaga County, New York where [Mother] was involved with the New York Department of Social Services as a result of issues resulting in a neglect petition being filed involving [J.D.D.] and then newly born [A.N.S.].

4. Both [Mother] and [Father] were referred to Dennis M. Kashurba, a licensed psychologist. [Mother] was evaluated by Mr. Kashurba who issued a report dated August 20, 2014 (Petitioner Exhibit 11). The purpose of the evaluation was to gather information pertinent to ascertaining what type of services would be appropriate to ensure the best interests of [Mother]'s two children. [Mother] had a history of anger management and impulse control problems. Mr. Kashurba in his report stated in part:

> "Her judgment in the session appeared to be good once she would pause and think about the answer she had impulsively given to a question. Her level of insight appeared to be at an early adolescent level of development and rather consistent with the obtained estimate of intellectual functioning as noted below."

In his diagnostic impression, Mr. Kashurba wrote:

> "Axis I     Impulse Control Disorder, NOS Relational Problem NOS Anxiety Disorder NOS ADHD, Combined Type Disruptive Behavior Disorder, NOS, by history Mathematics Disorder

> Bipolar Disorder, NOS, by history
>
> Axis II  Borderline Intellectual Functioning Histrionic Personality Disorder with Paranoid Traits and Obsessive Compulsive Features"

In Mr. Kashurba's summary of the various tests administered to [Mother], he stated:

> "All of her performances fell within a relatively consistent band between the normal late 10-year level of development and the normal early 12-year level of development."

5. In Mr. Kashurba's conclusion he stated:

> "The total information available at the present time suggests that [Mother] has below average overall intellectual ability and academic skills. She also appears to have long-standing mental health issues which may adversely affect her ability to harness her intellectual skills in terms of learning and independently implementing appropriate parenting techniques with her children. Thus, it does appear that there will be the ongoing need for comprehensive, multimodal mental health services as well as a variety of social services that can typically be facilitated through CYS. [Mother] claims that she plans to become enrolled in parenting classes at some time in the future whenever an opening exists for a six-week class. However, her mental health and cognitive issues clearly indicate that her need for services is well beyond the scope of typical parent training classes.

Additionally, the mental health issues of her paramour ([Father]) suggests that there will be an ongoing need for an external agent of control (CYS)...″

6. On September 24, 2014, Mr. Kashurba penned a report based upon his evaluation of [Father]. The purpose of that evaluation was to gather information pertinent to determining the probability of [Father] developing the ability to parent his children by himself or with the assistance of his paramour, [Mother]. In the clinical interview portion of his report, Mr. Kashurba states:

"[Father] presented on time for his scheduled appointment. Initially, his affect was calm and composed. However, later when he was informed of ongoing CYS concerns that were inconsistent with his perspective of the home and family situation, he became somewhat irate. He then proceeded to engage in denial and minimize the circumstances documented by the CYS caseworker, CYS social worker, and the IFS [("Independent Family Services")] home management person. [Father] actually appeared to possess grossly normal intellectual potential. He admitted that he has been hearing 'voices' for the past eight years' time. These voices were described as 'Bob' who supposedly is 'a mean son of a bitch and what I would be like if I was bad.' The other voice, Tom, was described as 'my good side.' Supposedly Tom tells [Father] not to listen to Bob. In addition to hearing these voices, [Father] admitted that he sometimes sees them. Bob was described as being 'tall and built' and being blond with blue eyes. Tom, on the other hand, was described as having dark hair and hazel eyes and being slim."

Further, Mr. Kashurba notes:

"[Father] clearly had a preoccupation with the overvalued idea regarding the status of the dogs in his life...[.] It was reasonably obvious that [Father] viewed the dogs at least as equals to the children in terms of status within the family and perhaps higher in status."

In Mr. Kashurba's summary he notes:

"[Father]'s performance on academic testing today found him to meet with frustration in basic reading skills at a beginning 4th grade level of difficulty. This performance placed him within the mildly mentally deficient range and only at the 1st percentile for his chronological age group."

Mr. Kashurba concludes:

"The total information available at the present time suggests that [Father] would have adequate intellectual potential to learn appropriate parenting strategies if his mental health issues could be ameliorated. In his current 'off meds' condition, there is little likelihood that he will be able to ameliorate his mental health difficulties, which are chronic and severe, to a degree that he will be able to harness his low average intellectual potential to learn and independently implement appropriate parenting strategies for the children. His overvalued idea regarding the status of the dogs (supposed service animals) suggests that these animals will continue to be a higher priority to [Father] than the children in the

household. Unfortunately, it would be this examiner's opinion that the supposed service animals have actually adversely affected [Father]'s ability to function in society."

7. As a result of a permanency review hearing held on April 20, 2015, the Juvenile Court found that the parents had only been minimally compliant with the permanency plan and that there had been minimal progress toward alleviating the circumstances necessitating the original placement.

8. Among the Juvenile Judge's orders, both parents were to enroll, participate, attend, and successfully complete parenting skill classes; comply with the agency social worker in addressing their mental health issues; no pets were permitted in the residence; and all pets were to be removed prior to any consideration of the children's return home to either parent's residence. [Father] was to have a psychiatric evaluation, which the Court notes he successfully completed on January 13, 2016 (Respondent Exhibit 2).

9. Another permanency review hearing was held on September 21, 201[5]. Again the Juvenile Court found only minimal compliance with the permanency plan and only minimal progress toward eliminating the circumstances necessitating the original placement. Supervised visits were to continue, and both [Mother] and [Father] were ordered to submit to random drug screens.

10. [Father] was again evaluated by Mr. Kashurba resulting in reports of November 5 and November 12, 2015. Mr. Kashurba noted in his report:

"It would be this examiner's impression that the prognosis for significant improvement in the parenting domain would not be substantially improved and in all likelihood would not

make positive contribution to the children. Thus, this examiner has no choice but to concur with the opinion of the CYS and home management staff that permanency through adoption would be in the children's best interests."

11. The results of the January 27, 2016 permanency review hearing are significant in that the parties again had made only minimal compliance with the permanency plan, but the Court further found that the children had been in placement for 15 of the last 22 months, neither parent was a placement option for the children, and that the parents had refused to allow the agency to inspect and photograph any residence since October of that year. In addition, even with attending mental health services both parents continued [to] display significant mental health instability. Both parents have cognitive limitations that are not likely to change in a reasonable period of time. The children need a permanent, consistent environment, and the goal was changed to adoption.

12. This Court further reviewed in detail Petitioner's Exhibit 13, which were court summaries given to the Juvenile Court in October 2014, April 2015, September 2015, and January 2016.

In the April 13, 2015 court summary it was noted that the home was found to be in a deplorable condition, including but not limited to garbage, food, clothes, dog feces and dog urine on the[] floor and furniture. Due to the ongoing nature of the house and the parents' aggressive conversation with the social worker, all social worker visits were moved to the [CYS] Office.

In the September 21, 2015 report, it was noted that the parents now lived separately from each other. [Mother] still required constant redirection to focus on the skills that she was being taught. The social worker continued to observe positive progress in her ability to control her

impulses and aggressive outbursts however. The social [worker] noted that neither parent appeared to be able to multitask and supervise and interact with both children at the same time. When the social worker addressed making good decisions, [Father] and [Mother] became very angry and defensive and verbalized their belief they are fine because they do not have their children so they are doing nothing wrong. The parents were not open[] to changing their lifestyle to demonstrate stability for their children to return home.

In the final report to the Court dated January 22, 2016, the social worker noted:

> "This social worker continues to have numerous concerns regarding [Mother]'s ability to provide for her children's basic needs, safety, and well-being due to her parenting deficit, cognitive limitations, and mental health. [Mother] has demonstrated that she is unable to adequately parent her children during a two-hour visitation, as well as maintain a stable lifestyle. It is this social worker's opinion [that] due to [Mother]'s cognitive limitations, her resistance to participate in parenting instruction, and her mental health it is not likely she can remedy these concerns in a timely manner.

> Regarding [Father], he has shown consistency when parenting one child; however, he is resistant to social work services. This social worker has serious concerns regarding his mental health stability and his need for changing his daily functioning. It is this social worker's opinion that [because of] [Father]'s mental health, cognitive limitations, and unwillingness to change his daily functioning [] it is also unlikely

he could alleviate the concerns in a timely manner."

13.    This Court is well aware that the termination of parental rights is one of the most serious and severe steps a court can take.  As to [Father], this Court admits to struggling between separating the concept of "reasonable doubt" versus a civil case, clear and convincing evidence.  This Court has examined the individual circumstances of this case and considered all explanations and accomplishments as to the [F]ather and the lack of explanations as to the [M]other on the issues before the Court.

14.    Addressing the best interests of the children, the Court may rely on the testimony of the caseworkers and/or social workers.  In the report (Petitioner Exhibit 10), the caseworker and caseworker supervisor note that:

> "[Father] and [Mother] have the barrier of their mental health and cognitive limitations that prevent them from making the necessary significant changes to provide for their children's safety and well-being in a reasonable period of time.  In addition, they lie, attempt to manipulate, and refuse to take responsibility for their actions.
>
> [Father] and [Mother] do love the children.  There is no bond between both parents and [T.S., Jr.] as they have only seen him three times since his placement from the hospital on January 15, 2016.  [Mother] has demonstrated minimal bonding with [A.N.S.] and [J.D.D.] and with that it was not a true parent-child bond with either due to her mental health and cognitive limitations.  For the brief period of time [Father] visited with [A.N.S.] alone a parent-child bond was present.    Once    the    visits    resumed

> together again both parents paid less attention and time with [A.N.S.]. The most significant bond was the bond between [J.D.D.] and [Father] though [Father] is not [J.D.D.]'s biological father.
>
> [J.D.D.] and [A.N.S.] have a genuine bond with their foster family and [T.S., Jr.] is bonding with his foster family which demonstrates that they will be able to build a healthy bond with an adoptive family."

. . . .

> 16. This Court has found that there does not presently exist a strong bond between [Mother] and her three children. In terminating the parental rights of [Mother], this Court has found that this will best meet the developmental, physical, and emotional needs and welfare of the children.
>
> 17. In regard to [Father], the Court has found that any bond that exists is minimal. Further, that in terminating the rights of [Father] to his two children, this Court has found that this will best meet the developmental, physical, and emotional needs and welfare of those children.

Order, 12/28/16 at 1-11.

By order entered December 28, 2016, the trial court terminated the parental rights of both Mother and Father. The trial court determined that CYS established a basis for termination under 23 Pa.C.S.A. § 2511(a)(1), (2), (5), & (8). (*Id.* at 11-12.) The trial court also found that termination best met the developmental, physical, and emotional needs and welfare of the Children under Section 2511(b). (*Id.* at 10-11.) This timely appeal

followed. In response to Father's Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, the trial court relied on its Opinion and Order of December 28, 2016. (Order, 2/14/17 at 1.)

Father has raised the following issues for this court's review on appeal:

1. Whether the trial court properly considered the efforts made by Father to alleviate the conditions which led to the agency's filing a Petition to terminate his parental rights[?]

2. Whether the Petitioner below had met its burden of terminating Father's parental rights by clear and convincing evidence[?]

3. Whether the trial court erred in relying upon the testimony of an expert when said expert was relying upon inaccurate information[?]

Father's brief at 1-2.

When considering appeals such as the one presently before us, we are guided by the following:

When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict.

*In re: Involuntary Termination of C.W.S.M. and K.A.L.M.*, 839 A.2d 410, 414 (Pa.Super. 2003). We are also aware that:

> In a proceeding to involuntarily terminate parental rights, the burden of proof is upon the party seeking termination to establish by "clear and convincing" evidence the existence of grounds for doing so. The standard of "clear and convincing" evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*In re A.L.D.*, 797 A.2d 326, 336 (Pa.Super. 2002) (quoting *In re Adoption of Atencio*, 539 Pa. 161, 650 A.2d 1064, 1066 (1994)).

*In re C.L.G.*, 956 A.2d 999, 1003-1104 (Pa.Super. 2008) (*en banc*).

> Moreover, an abuse of discretion occurs "when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will." *Id.* Generally,

> > [o]ur case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. *In re D.W.*, 856 A.2d 1231, 1234 (Pa.Super. 2004). Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). *In re B.L.L.*, 787 A.2d 1007, 1013-14 (Pa.Super. 2001). Only after determining that the parent's conduct warrants termination of his or her parental rights must the court engage in the second part of the analysis: determination of the needs and welfare

- 12 -

of the child under the standard of best interests of the child. ***C.M.S.***, ***supra***, [884 A.2d 1284, 1286-87 (Pa.Super. 2005)]; ***A.C.H.***, ***supra***, [803 A.2d 224, 229 (Pa.Super. 2002)]; ***B.L.L.***, ***supra***. Although a needs and welfare analysis is mandated by the statute, it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights under the statute. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child.

***In re Adoption of R.J.S.***, 901 A.2d 502, 508 (Pa.Super. 2006).

***Id.*** at 1004 (brackets in original).

We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), in order to affirm. ***In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (***en banc***), ***appeal denied***, 581 Pa. 668, 863 A.2d 1141 (2004). Here, we analyze the court's decision to terminate under Section 2511(a)(2) and (b), which provide as follows.

**(a) General Rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the

> conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> * * *
>
> **(b)** **Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1215-1216 (Pa.Super. 2015).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.
>
> *In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds

- 14 -

> for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." ***In re A.L.D.***, 797 A.2d 326, 337 (Pa.Super. 2002) (citations omitted).

***Id.*** at 1216.

The record indicates that Father failed to comply with the court's directives. For example, Father refused to get rid of the Pitbull dogs, which was a condition of having the Children returned. At one time, there were as many as 10 dogs in the residence, including 7 puppies. (Notes of testimony, 6/22/16 at 37.) The residence was covered in dog feces and smelled of ammonia due to the presence of dog urine. (***Id.*** at 169.) The Pitbull dogs were aggressive, overly protective, and malnourished, leading to a fear that they would attack the Children. (Notes of testimony, 9/20/16 at 131, 152-153.) Mr. Lonnie Maldet, a CYS caseworker, testified that Mother and Father asked for money for dog food and baby formula. (***Id.*** at 131.) He was concerned that a hungry Pitbull dog could turn on one of the Children. (***Id.***) Sabrina Uebel, another CYS caseworker, testified that there was one cup of dog food for three large Pitbulls, including one that was pregnant. (***Id.*** at 152.) The baby slept on the floor with the hungry Pitbulls. (***Id.***) Ms. Uebel testified that the dogs were large and aggressive and had to be put in the room upstairs during CYS visits. (***Id.*** at 152-153.)

Father could not afford to feed the dogs and lacked the motivation to obtain free food from the pet food pantry. (***Id.*** at 152.) The upstairs

nursery had been damaged by the dogs. (*Id.* at 31.) It was clear that Father put the needs of the dogs above those of the Children. (*Id.* at 15, 124, 156; 6/22/16 at 136-137, 178.) Ashley Shaffer, a licensed social worker employed by CYS, testified regarding Father's relationship with his dogs:

> My concern with the dogs was it was court ordered from the beginning that the children would not be considered to go home without the removal of the dogs or any animals [from] that home. Your feelings of the dogs had been more than the feelings of your children. You had expressed to me that the dogs give you love. They make you want to be a better person and that you love them very much and you did that for your mental health. At one point you had stated to me that you could not get rid of your dogs because you were afraid they would feel abandon [sic] and you could not let your dogs feel that way. However, at no point did you ever say that about your children in foster care.

Notes of testimony, 6/22/16 at 197-198.

Mr. Kashurba concluded that Father "clearly had a preoccupation with the overvalued idea regarding the status of the dogs in his life." (Psychological Evaluation, 9/24/14 at 4.) "It was reasonably obvious that [Father] viewed the dogs at least as equals to the children in terms of status

within the family and perhaps higher in status." (*Id.* at 4-5.) Father never did remove the dogs despite the court's explicit directions.[1]

Father had numerous financial issues that were never remedied. While he made efforts at budgeting, he continued to do things to cause his own financial instability such as losing subsidized housing by failing to notify the landlord that Mother was living with him. (Notes of testimony, 9/20/16 at 14.) Ms. Shaffer testified that, "[W]e discussed it on a weekly basis that all they had to do was contact the Johnstown Housing Authority and put [Mother] on the Section 8 lease. Despite being told that weekly, they never followed through and he in fact lost his Section 8 housing." (Notes of testimony, 6/22/16 at 187.) Father failed to pay his bills on time each month. (Notes of testimony, 9/20/16 at 14.) When the heating bill was not paid, the family would all sleep together on the living room floor. (Notes of testimony, 9/20/16 at 33, 94-95, 152.) Mother and Father relied on Father's social security disability income to pay the bills; however, the family was financially unstable. (Notes of testimony, 9/29/16 at 13.) Father received $775 per month and his monthly expenses were approximately $750. (*Id.* at 13-15.) Father did claim he received approximately $200-250 cash per week doing work under the table. (*Id.* at 23, 28.) However, Mother and

---

[1] According to Father, the Pitbulls were "service animals." Father presented a letter dated May 1, 2013, from Thomas Maltese, M.D., a psychiatrist, stating that the dogs were therapeutic. (Notes of testimony, 6/22/16 at 142-143.) According to Dr. Maltese's letter, the dogs helped ground Father in reality and relieve stress. (*Id.* at 143.)

Father often could not afford diapers for the Children. (Notes of testimony, 9/20/16 at 156.) Despite their financial pressures, there was testimony that Father would purchase crab legs for himself. (*Id.*)

The condition of the family's residence was described as deplorable and unsanitary. The house was littered with garbage and dog waste. (Notes of testimony, 6/22/16 at 169.) There was clutter and dried vomit throughout the house. (*Id.* at 21-22, 33.) Ms. Shaffer testified that the smell made her physically ill. (*Id.* at 169.) The kitchen was covered in trash, empty beer bottles, and dirty dishes. (Notes of testimony, 9/20/16 at 33.) Ms. Gustkey-Patterson testified that the house smelled like dogs. (*Id.* at 100.) There was trash and cockroaches in and around the home. (*Id.*) Sometimes she was afraid to enter the property. (*Id.* at 99-100.) In addition, the residence was not child-proofed and was unsafe, with knives lying around within reach of the Children. (*Id.* at 31, 101, 142.) Mr. Maldet testified that there were pocket knives, hunting knives, and kitchen knives strewn about, as well as cigarette butts and lighters. (*Id.* at 136, 142.) There was evidence of drug and alcohol abuse at the home. (*Id.* at 87-90; notes of testimony, 6/22/16 at 194-195.) Father never complied with the court's directive to maintain a consistently safe and clean home.

There was also testimony that Father was unable to appropriately care for the Children. Father was unable to multi-task and effectively parent the children together. (Notes of testimony, 6/22/16 at 39.) Father appeared to

be overwhelmed during the supervised visitations and could only focus on one child at a time. (*Id.* at 170.) Father was often unprepared for visits and would leave the brief visits to smoke cigarettes. (*Id.* at 39, 171.) He would ignore suggestions from the CYS caseworkers. (*Id.* at 40-41.) Father disregarded safety concerns. (*Id.*) Father was often defensive and combative when given suggestions or advice. (*Id.* at 173.) During one of the supervised visits, A.N.S. was gagging and choking on a large piece of hot dog. (*Id.* at 41.) When instructed that the pieces were too large for A.N.S., Father simply ignored the caseworker and continued to eat his own hot dog while the caseworker attended to A.N.S. (*Id.*) In addition, neither parent made any effort to change the Children's diapers. (Psychological Evaluation, 9/24/14 at 2.) When prompted by the caseworker to change one of the Children's dirty diapers, Father and Mother argued over who was going to do it. (*Id.*) When they did change the Children's diapers, they would not dispose of the dirty diapers properly. (Notes of testimony, 9/20/16 at 144.)

Furthermore, Father failed to cooperate fully with IFS and his mental health providers and follow through with recommendations from the psychological evaluations. Father denied access to his home to caseworkers on numerous occasions. (Notes of testimony, 6/22/16 at 34-36, 60.) Father was discharged from the Alternative Community Resource Program ("ACRP"). Father's attendance was inconsistent, and he was ultimately discharged for failure to comply with the attendance policy. (Notes of

testimony, 9/20/16 at 80-82.)  As a result, Father's outpatient therapist at ACRP, Alyssa Gusmerotti, testified that she was barely able to "scratch the surface" of working with Father.  (*Id.* at 82.)

Father argues that he successfully completed the Nulton Diagnostic and Treatment Center's Adult Partial Hospitalization Program on January 13, 2016.  (Father's brief at 6.)  Father argues that he attended all of the sessions, and his psychiatrist testified that he was very cooperative.  (*Id.*, citing notes of testimony, 9/20/16 at 117-118.)  CYS did not dispute that Father finished the program.  (CYS's brief at 15.)  However, Father conceded that the program essentially taught him the same skills he had already acquired in prior treatment and that he did not get much out of it.  (Notes of testimony, 9/20/16 at 184, 204; 9/29/16 at 10.)  Father testified that it was basically the same as a program he attended in New York.  (Notes of testimony, 9/29/16 at 10.)  In addition, there was testimony that Father's attitude during the program was that of resistance and that his progress was not significant.  (Notes of testimony, 6/22/16 at 42, 164.)  Ms. Shaffer testified,

> Throughout the time [Father] was in partial, and I would ask him what he was learning, his response would always be, I haven't learned anything.  There were issues where during group [Father] was making inappropriate comments about drugs and alcohol.  There was a man who had been sober for over 20 years and is re-learning coping skills and [Father] told him to go have a beer.

*Id.* at 176-177. Stephen Bower from Nulton testified that Father successfully completed the program but that he could not remember whether or not they had any problems with Father during group therapy sessions. (Notes of testimony, 9/20/16 at 64-66.)

Father was ordered to attend the program in October 2014 by the juvenile court judge. (Case record summary, CYS's brief, Appendix 1 at 3-4; notes of testimony, 6/22/16 at 38.) By his own admission, Father did not enroll in the program until August 2015, when he finally decided it was necessary to "kiss butt" to try to get the Children back. (Notes of testimony, 9/20/16 at 199-201.) In the meantime, while Father delayed, A.N.S. and T.S., Jr., were growing up in foster care.

Father also contends that the reports and recommendations of Mr. Kashurba, upon which the trial court relied, were based upon incorrect information. (Father's brief at 9.) According to Father, Mr. Kashurba based his recommendations upon an erroneous report by Ms. Shaffer that Father was not compliant with the program and was close to being removed from the program. (*Id.* at 8-9.) In fact, Father argues that he successfully completed the program.

Any such conflicts in the evidence were for the trial court to resolve. The trial court heard the testimony that Father completed the program. Furthermore, as CYS points out, Mr. Kashurba did not rely solely on Ms. Shaffer's report that Father was not meeting the requirements of the

program. (CYS's brief at 16.) In fact, Mr. Kashurba's September 24, 2014 report was authored 10 months before Father even started the program. (*Id.*) In addition, Mr. Kashurba reviewed numerous documents and reports from multiple sources and also conducted his own interviews with Father, including observing him interact with the Children. (*Id.*; notes of testimony, 6/22/16 at 110, 113-120.) Mr. Kashurba's conclusion that Father was unlikely to make any significant improvements in parenting skills or make any positive contribution to the Children was based on a multitude of factors, including personal observations, not just Ms. Shaffer's report.

Finally, Father argues that the main reason the Children were removed from the home was because of poor housekeeping and financial problems. According to Father, he made an effort to implement a workable monthly budget and also to improve the condition of the residence. (Father's brief at 10.)

There was testimony that Father attempted to establish a workable budget. (Notes of testimony, 9/20/16 at 16.) However, the record also reflects that Father had continuing financial issues. One of the juvenile court's requirements was that Father pay rent, utilities, and other bills on time. (Notes of testimony, 6/22/16 at 28.) Ms. Kathy Scaife from IFS testified that while Father made an effort, the utility bills were not consistently paid on time. (Notes of testimony, 9/20/16 at 13-15.) There was testimony that Mother and Father shut off the heat in the winter to save

money. (Notes of testimony, 6/22/16 at 191-192.) Some of Father's financial problems were the result of mismanagement, *e.g.*, trying to feed 10 dogs and purchasing $30 in crab legs for his own consumption while the Children went without diapers. (Notes of testimony, 9/20/16 at 156.) If Father had complied with the court's order to get rid of the dogs, it would have freed up some money to take care of the Children's needs.

Regarding the deplorable conditions, while they would show some measurable improvement over short periods of time, they would always return to the status quo. (Notes of testimony, 9/20/16 at 16.) Ms. Scaife testified that some months the house looked okay and then other months it was terrible. (*Id.*) The conditions were not consistently acceptable. (*Id.* at 17-18.) Ms. Scaife described clothing, papers, empty food containers, and food wrappers spread throughout the home. (*Id.* at 30-31.) She testified that the clutter was a tripping hazard for the Children. (*Id.*) According to Ms. Shaffer, in April 2015 she had to move visits off-site due to poor housekeeping. (Notes of testimony, 6/22/16 at 169.) She described dog feces and garbage strewn about the floor, as well as the odor of urine and marijuana smoke. (*Id.*) This testimony was corroborated by CYS caseworker Barbara Brzana who described a house full of fecal matter, dried vomit, clutter, and garbage. (*Id.* at 33.) On each of three occasions she visited the home from January 2015 to March 2015, the conditions were the

same. (***Id.***; notes of testimony, 9/29/16 at 36.) Any inconsistences in the accounts of the witnesses were for the trial court to reconcile.

In addition, as stated above, Father refused caseworkers entry into the residence on numerous occasions. (Notes of testimony, 6/22/16 at 60.) So, there is no way of knowing what the house looked like on those occasions when caseworkers were denied entry. Moreover, it is clear that the trial court's order was not based solely on the parties' finances or the condition of the home. As set forth at length ***supra***, the Children were in physical and psychological danger. They were living in filth. Besides the Pitbulls and knives lying around, there was testimony of ongoing drug use and domestic violence. (Notes of testimony, 6/22/16 at 44, 194-195.) It was readily apparent to the trial court that despite 15 months of intensive services, Father was unable or unwilling to remedy the conditions which led to the Children's placement, and they would continue to be at risk if returned to his care. Our review of the record supports the trial court's conclusion that Father is incapable of parenting the Children, and that his parental incapacity has left the Children without essential parental care or control. Additionally, it was reasonable for the court to determine that Father will not, or cannot, remedy this incapacity.

> Next, we consider whether termination was proper
> under Section 2511(b).[2] Section 2511(b) "focuses

---

2 "Although [Father] does not challenge the trial court's analysis of Section 2511(b), we proceed to address this issue nonetheless." ***In re C.L.G.***, 956 A.2d at 1010.

on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa.Super. 2010). As this Court has explained, "Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered" as part of our analysis. *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa.Super. 2008). "While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child." *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (citing *K.K.R.-S.*, 958 A.2d at 533-36).

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*Id.* (quoting *In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010)); *see also In re T.D.*, 949 A.2d 910, 920-23 (Pa.Super. 2008), *appeal denied*, 601 Pa. 684, 970 A.2d 1148 (2009) (affirming the termination of parental rights where "obvious emotional ties exist between T.D. and Parents, but Parents are either unwilling or unable to satisfy the irreducible minimum requirements of parenthood," and where preserving the Parents' rights would prevent T.D. from being adopted and attaining permanency).

***In re Adoption of C.D.R.***, 111 A.3d at 1219.

Here, T.S., Jr., was placed directly from the hospital after birth and had spent his entire life in the foster care system. A.N.S. was only 2½ months old when she was removed from Father's care. There was no meaningful bond between Father and the Children. (Notes of testimony, 6/22/16 at 180-181.) Father rarely showed A.N.S. any attention. (***Id.*** at 44-45, 174-175.) In fact, Father focused mainly on J.D.D., who is not his biological child. (***Id.*** at 44.) The trial court found that the Children are successfully bonding with their foster family, indicating that they will be able to build a healthy bond with an adoptive family. (Order, 12/28/16 at 10 ¶14.)

The evidence supports the trial court's determination that it would be in the Children's best interest if Father's parental rights were terminated. Clearly, it would not be in the Children's best interest for their lives to remain on hold indefinitely in hopes that Father will one day fulfill his obligations and be able to act as their parent. ***See In re Adoption of C.D.R.***, 111 A.3d at 1220, quoting ***M.E.P.***, 825 A.2d at 1276 ("A child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." (citations omitted)). Father is not entitled to relief.

Accordingly, because we conclude that the trial court did not abuse its discretion by involuntarily terminating Father's parental rights pursuant to Section 2511(a)(2) and (b), we affirm the order of the trial court.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/26/2017